## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JACKLYN WILFERD, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. |
| | ) 20-CV-01955-SDG |
| v. | ) |
| | ) |
| DIGITAL EQUITY, LLC, and KHURAM | ) |
| DHANANI, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AMENDED COMPLAINT

Plaintiff Jacklyn Wilferd ("Wilferd" or "Plaintiff"), by and through her

attorneys, hereby alleges as follows against defendants Digital Equity, LLC

("Digital Equity"), and Khuram Dhanani ("Dhanani," and collectively,

"Defendants"):

## INTRODUCTION

1.      This is a diversity and declaratory judgment action arising under 28

U.S.C. § 1332, and 28 U.S.C. §§ 2201 and 2202, pursuant to Georgia and

California state law, alleging causes of action for an accounting, breach of contract

and the covenant of good faith and fair dealing, breach of fiduciary duty, fraud,

financial abuse of an elder, defamation and for a declaratory judgment, seeking,

inter alia, compensatory, punitive and trebled damages, attorneys' fees and costs, as well as a declaration of the rights of the parties related to the claims herein.

2.      In this case, plaintiff Jacklyn Wilferd purchased wines.com in 1994 and developed the domain and website for 24 years, before entering into profit-sharing agreements in 2018 with defendants to further develop and sell the domain and website as a commercial product, while generating revenue in the interim. Prior to entering into the profit-sharing agreements with defendants for development and sale of the domain and website, Wilferd had either rejected or did not complete offers or agreements to purchase the domain ranging from $700,000 to $2.5 million, as she wished to maximize the value of her sale as a 68-years-old senior seeking to retire.  Dhanani, however, simply swindled Wilferd, paying her $50,000 for transfer of the domain and website to his company, Digital Equity, LLC, to facilitate a sale, but doing basically nothing to develop the website, except post pornographic content under Wilferd's name (contrary to his promises).  And then, after selling the domain and website only a year later in 2019, Dhanani claimed that defendants had no obligation to pay Wilferd anything more under their profit-sharing agreements, because the sale was purportedly not a "product sale," but a "corporate-level asset sale," a distinction nowhere part of their agreements.  To date, Dhanani has refused to provide Wilferd the full details

regarding the sale or an accounting for the company in which she was a profit-sharing partner.

3.      By this action, Wilferd seeks to recover the substantial value of the domain and website she developed for 24 years, worth between $1 million and $5 million, which defendants disingenuously claim they purchased from her for only $50,000—with no further obligation under their profit sharing agreements to account for the sale of the domain and website—in breach of their agreements, fiduciary duties and other obligations.  Because their misconduct also constitutes an egregious fraud and elder abuse, Wilferd seeks to further recover punitive and trebled damages, attorneys' fees and costs in this action.

## **PARTIES**

4.      Jacklyn Wilferd is an individual, who resides in and is a citizen of California.

5.      Digital Equity, LLC, is a Georgia limited liability company, formed on May 3, 2017, with its alleged principal place of business at The UPS Store, 4850 Sugarloaf Parkway, Suite 209-111, Lawrenceville, Georgia 30044.

6.      Khuram Dhanani is an individual, and is a citizen of Georgia, who resides at 1691 Telfair Chase Way, Lawrenceville, GA, 30043, and upon information and belief, is the sole member of Digital Equity, LLC.

## JURISDICTION AND VENUE

7.     This action arises under the laws of the State of Georgia and California.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of one state – California – and all defendants are citizens of a different state – Georgia.  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  At a minimum, Plaintiff seeks damages related to and in the amount of the value of her interest in wines.com, which is at least $500,000.

8.     This Court also has jurisdiction over Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.     Venue is proper in this District pursuant to 18 U.S.C. §§ 1391(b)(1) and 1965(a), insofar as all Defendants reside and transact business in this District.

## FACTS

10.     On September 19, 1994, Jacklyn Wilferd ("Wilferd" or "Plaintiff") purchased the domain wines.com.  Like other single-word, commercially-marketable product related domains, wines.com is highly valuable, in the range of $1 million to $5 million, depending on the buyer in any commercially reasonable, arms-length transaction.  In 2000, Wilferd received a $2.5 million offer for the domain, and a $2 million offer in 2008.  While she entered into various agreements

4

regarding a potential sale, for various reasons, she never completed any sale and retained ownership of the domain.

11.     An independent, leading domain appraisal website, Estibot.com, appraises wines.com at $2,973,000:



12.     In 2012, Wilferd resumed active management of the domain, and through 2018, cultivated the domain as a marketable commercial product for sale to an interested buyer.  Wilferd developed a website with articles, videos, discussion boards, and terminology and resource pages on wines and matters of social interest among oenophiles (i.e., wine connoisseurs), as well as developed substantial linking relationships, increasing traffic to the website and thereby increasing its value to a potential purchaser of the domain as a commercially viable product.  See, e.g., Internet Archive, Wines.com, WAYBACK MACHINE (Jan. 3,

2017), https://web.archive.org/web/20171228061858/http://wines.com/ (last visited Apr. 18, 2020).  In addition, in partnership with Lisa Consani ("Consani"), in 2017, Wilferd developed an ecommerce wine store on the website.

13.    These actions were critical because a domain and website together form a marketable commercial product.  It is misleading to the point of fraud to suggest that they are merely a "Domain Name" or intellectual property right—this is false.  In this case, for example, while the domain is the name wines.com, it is more than merely a "name."  A domain is comprised of two different levels: a top-level domain (TLD) and a second-level domain (SLD).  The TLD is the suffix, in this case ".com," which is meant to communicate the purpose or location of a website.  .com, of course, indicates that the domain is intended for commercial purposes—i.e., for buyers to use to establish a commercial enterprise, not merely an abstract intellectual property right.  The SLD is the prefix, in this case, "wines," which reinforces the brand or website identity.  Brands, of course, are associated with products.

14.    A website is collection of files and coding language in the back-end architecture that produces a front-end experience for Internet users—it is one of the principal means by which a domain can be developed into an integrated product.  So, when a user goes to www.wines.com on the Internet, what a user sees on the

screen is not merely the URL of the domain, but also the website built on the domain.  The domain and website are a manufactured product, which contributes substantially, if not immeasurably to the value of the domain.  Indeed, websites host content and coding for search engine optimization ("SEO"), which all combine to drive traffic to the domain and website and increase its visibility, and therefore valuation.  In this case, for wines.com, Wilferd developed a website, with articles, forums and ecommerce that dramatically increased the value of the domain wines.com, by transforming the raw TLD and SLD into a commercially refined, integrated product.

15.     Confirming the integrated product view, the methodology used to value domains, for instance, in this case, the approximately $3 million valuation that Estibot.com places on wines.com, is not merely based upon the name "wines.com."  It is based on, as Estibot.com explains:

> [A] statistically derived model to calculate the value of a domain name based on over one hundred internal and external domain attributes. … Internal attributes include domain length, extension, word count, pronunciation and other characteristics directly linked to a specific domain. **External attributes refer to third party data such as a domain's search popularity, type-in rank. age and much more.**  The characteristics of a specific domain name are then compared to those of previously sold domain names and the valuation is based on that comparison.

Estibot.com, Methodology, https://www.estibot.com/methodology (last visited Jun. 11, 2020) (emphasis added).

16.    The domain and the website, therefore, are for commercial purposes not easily separable, if at all.  Like a gold necklace sold in a store, there is the gold, and then there is the manufacturing process and design to turn it into a product. While the gold can be melted back into a base commodity, the refined necklace is no less a product.  This is true of all products, which comprise various components, including intellectual property rights, none of which make the combination of elements any less a product.  The same is true of domains, and in this case, the product www.wines.com.  And even more so, because merely deleting a website or selling the domain separately does not automatically erase the traffic and value the website created, and thereafter continues to create.

17.    Following Wilferd's substantial development of wines.com, in 2018, Consani introduced Wilferd to defendant Khuram Dhanani ("Dhanani") as a potential business partner to help further develop wines.com, as Dhanani claimed to have substantial capital he would contribute to the business, as well as experience in developing domains for sale as commercial products.

18.    Indeed, during their telephone conversations in and around July 2018, Dhanani represented to Wilferd that, as part of the parties' joint venture arrangement, he (1) would invest $200,000-$300,000 of his own money into further developing wines.com, (2) had a "team" who could help further develop the

website to a $3-5 million valuation "fast," and (3) in the arrangement, they would split all profits, including from the sale of the domain and website.  Wilferd—who was 68 years old at that time—was clear that, having received other offers for wines.com, and even one as recently as March 2018 for $700,000 from a broker (and another in July 2018 that she did not explore), the website was essentially her retirement fund, and in partnering with Dhanani, she would need at least $1,000,000 from their arrangement, which he claimed was achievable.

19.     Dhanani offered to draft an agreement between Digital Equity and Wilferd, and sent Wilferd two agreements: (1) a domain name purchase agreement ("Domain Agreement"), transferring wines.com to Digital Equity, LLC ("Digital Equity" or the "Company"), a limited liability company, registered in Georgia, on May 3, 2017, of which, upon information and belief, Dhanani was the sole member, in exchange for a payment of $50,000 to Wilferd and (2) a profit-sharing agreement ("Profit Agreement"), in which Wilferd would receive from Digital Equity "50% (fifty percent) of net profits after expenses that are generated by Company directly from product sales, advertising sales, accessory sales, affiliate sales, ticket sales, tour sales and commision [sic] sales."

20.     The Profit Agreement did not list every "product sale" or other "sale," nor limit the products covered by the agreement to products sold on wines.com, but

provided general categories of sales covered.  Further, the Profit Agreement did not define the word "products," which usually and customarily includes, and the parties to the agreement intended it to include, a domain and website developed for commercial sale as a product, in addition to any wines sold on the website.

21.    Also, the Profit Agreement provided that Digital Equity "will provide [Wilferd] access to financial information upon request, including revenue, sales, expenses, screenshots, and profits."

22.    While in the Domain and Profit Agreements, Digital Equity and Wilferd agreed to a limited merger clause, that clause only covered "the subject matter herein" and the "subject matter hereof," excluding matters that were not expressly discussed in the agreement—which the various operating and sale terms and conditions related to the domain and website were not, which were covered by separate oral agreement.  In addition, while in the Profit Agreement, Digital Equity stated that "**<u>Company</u>** makes no guarantees, representations or warranties" regarding a limited list of issues, Dhanani never made any such representation in any agreement.  "Company" was expressly defined in the Profit Agreement as only "Digital Equity, LLC," and did not include Dhanani or any of its officers, employees or agents as is normal practice when further disclaimers are intended to provide protection beyond the corporate entity itself.

23.     To the contrary, to induce Wilferd to sign the agreements, Dhanani personally claimed that (1) prospective buyers would not work with him unless the domain was transferred to Digital Equity, (2) he already had an interested company willing to pay $200,000 for advertising on the website, and (3) Wilferd would receive $100,000 within thirty days, in addition to further payments for product sales, which would only increase as the Christmas season approached.  As to the sale of the primary product in the proposed venture, wines.com, to allay Wilferd's concerns that she would not receive her desired retirement of $1,000,000 from the sale under their profit-sharing agreements, Dhanani further represented and agreed, as part of their joint venture and agreement, that (4) Defendants would not sell the website and domain for less than $3-4 million, (5) Wilferd would have the right to approve any sale, and (6) prior to any sale, Defendants would actively operate the website as a "cash cow," producing between $5,000 and $10,000 per month in profits.  Wilferd reasonably and justifiably relied upon these representations by Dhanani, given his claimed superior business acumen and experience in developing domains for sale as commercial products.

24.     Both the Domain and Profit Agreement were executed by Wilferd and Digital Equity on July 15, 2018 (attached hereto as **Exhibit A**).  They were executed together, which is why the sale of the domain and website wines.com was

for only $50,000—an extreme discount to market value to facilitate the profit-sharing arrangements between the parties.  Comparable websites with popular, commercially-marketable, single-word domain names sold in arms-length negotiations have been sold in the range of $3 million to $30 million.  For example, loans.com sold for $3 million in 2000.  Hotels.com sold for $11 million in 2001.  Candy.com sold for $3.0 million in 2009.  Toys.com sold for $5.1 million in 2009.  Slots.com sold for $5.5 million in 2010.  360.com sold for $17 million in 2015.  Voice.com sold for $30 million in 2019.

25.    After the execution of the agreements, it started to become clear that virtually everything about Dhanani was and is a fraud.  While on his LinkedIn.com page, he promotes publications like "Inside The Mind Of A Millionaire: E-Commerce Entrepreneur Khuram Dhanani On Success



& His Next Move," on Forbes.com, and "How Khuram Dhanani Went From Unemployable To CEO" on GoodMenProject.com, all of his alleged

"publications" are, upon information and belief, fabricated by Dhanani himself or were paid advertising publications.  Indeed, an entire Wikipedia.com page is devoted to debunking Dhanani's alleged notoriety.  See Wikipedia.com, Wikipedia: Articles for deletion/Khuram Dhanani, https://en.wikipediam.org/wiki/Wikipedia:Articles_for_deletion/Khuram_Dhanani (last visited Jun. 10, 2020).

26.     There is no objective evidence that any of the alleged companies that he claims to have "founded" to pull himself out of unemployment, either existed or were sold.  "ZQ Networks," which Dhanani claims on LinkedIn.com to have created in 2010, and was supposedly "[a]cquired by multiple strategic buyers," was never a registered corporation, not in Georgia or Delaware.  Clear Spark, LLC, which was registered in Georgia in 2012 and which Dhanani claimed he sold to a "Chicago investor group," according to his LinkedIn.com page, was in fact administratively dissolved by the Georgia Secretary of State "for its failure to deliver its annual registration, together with all required fees and penalties, within 60 days after it was due, and/or having been without a registered agent or registered office in this state for 60 days or more."  Indeed, all the businesses he has incorporated in Georgia were administratively dissolved in a relatively short period after he created them.

27.    As to Digital Equity (Dhanani's only active, but noncompliant business in Georgia, which is now also subject to dissolution), its purported business  "Principal Office Address," according to his registration with the Georgia Secretary of State—4850 Sugarloaf Parkway, STE 209-111, Lawrenceville, GA, 30044—is in fact The UPS Store, sandwiched in between a Subway and GNC, according to Google Earth, and the process servers retained by Plaintiff who attempted to serve Digital Equity at this address.  He previously registered a now administratively dissolved corporation, Bland Brands Group, LLC, to 6600 Sugarloaf Pkwy, Ste. 400-221, Duluth, GA, 30097, another The UPS Store location.

28.    And he lives at home with his mother, who owns 1691 Telfair Chase Way, Lawrenceville, GA, 30043, out of which the remainder of his now dissolved corporations operated.

29.    In the months following execution of the agreements, Wilferd discovered that, contrary to his claims, upon which she relied, Dhanani did not have any advertising agreements for the website, did not have any money to invest

14

into the website, and did not operate the website or develop its content for sale. Indeed, Wilferd discovered that Dhanani did not even drink wine.

30.     Instead, Dhanani stated to Wilferd that the best way forward and to generate revenue was to find potential investors to fund the development of the website and manage its operations.  In or around September 2018, Dhanani attempted to bring on a company called Underground Cellars to invest in and operate the website (with an option to purchase the domain and website).  But after months of delay and inaction, Underground Cellars failed to make any investment or complete a purchase of the domain and website.

31.     Consequently, for a period of nine months from July 2018 to April 2019, Dhanani made no effort to update, operate or otherwise fund the website.  Wilferd repeatedly offered to return the $50,000 that Digital Equity paid for the transfer of the domain, seeking to rescind the Domain Agreement, but Dhanani refused.

32.     Then, starting in April 2019, a series of blog articles started appearing on the website, attributed to Wilferd (which she did not author), filled with basic grammatical errors and broken sentence structures, and salacious, pornographic topics such as "PORN STAR SYDEY COLE CALLED HER FAVOURITE WINES (ENG), which read in part:

Sydney Cole is one of the newest porn stars on the internet, but she is also ready to take over the industry.  She looks and performances are perfect.  She's a brunette who dyes her hair blonde and she has dark green eyes.  She's a Florida babe, born in Tampa on November 2nd 1996.  What I like the most about her are the boobs.  She doesn't have big boobs, but they look magnificent.  Her cup size is 32B, but the nipples are the ones that matter.  She has big areolas that are the perfect size for sucking.  Although she has puffy nips, they are hard and pointy.  The boobs might not be big, but they surely match the rest of her body.  She's 5 feet and 2 inches tall and weighs 105 lbs.  Sydney Cole also has some sexy long legs and she has ribbon tattoos on both her hamstrings.  Besides these cute and sexy ribbons, she also has a tattoo of musical notes on her upper back.  As for piercings, she has one in her navel.  All in all, she is one of the hottest newcomers.  She will surely change a bit in the next period, as she is only 20 years old now and her body will still change for the next couple of years, but I'm sure she will look just as hot, if not hotter.

This young porn star has gained her popularity thanks to the cumshots in BrattySis.  Bratty Sisters it's when horny young ladies give into the drive of their hormones inside family.  Teenage girls can be the worst.  They're hot as hell with loud mouths and bitchy attitudes.  They know they are jailbait yet still walk around in tiny shorts with their ass cheeks hanging out.  Then they hit 18 and are fully legal for you to watch in porn.  The naughtiest among them love being on camera and showing that fresh pussy to the world.  That's when teenage girls become the absolute best!

The article then lists "THE TOP TEN WINES BY SYDNEY COLE."  See Jackie Wilferd, PORN STAR SYDNEY COLE CALLED HER FAVOURITE WINES (ENG), WINES.COM (Jul. 31, 2014), https://wines.com/blog/porn-star-sydney-cole-called-her-favourite-wines-eng/ (last visited Apr. 18, 2020).  The article was backdated—which is a simple matter of selecting any desired date in the content management system—to appear as if it had been on the website for years.

33.     Defendants Dhanani and Digital Equity were directly responsible for either authoring and/or hiring foreign contractors to author these posts, as well as directly participating in and approving their publication.  Upon information and belief, the posts were not independently created by any third party.  Indeed, at the time, and still today, the website www.wines.com did not and does not allow independent user content to be posted on the website.  The only content posted to the blog is by users authorized and approved by the website owners, in this case, Digital Equity.

34.     To be sure, this was not the first time that Dhanani had used either fictional or actual foreign contractors to create content for himself, as he did with the blogs at issue here.  Upon information and belief, Dhanani created the YouTube.com video "Khuram Dhanani and Chelsea Banks on the London Digital Podcast," available at https://www.youtube.com/watch?v=FGxPWAFvqN8, manufacturing a fictional female with a British accent, "Chelsea Banks," whose voice in the video is simply a computer-generated voice that Dhanani created or used.  The YouTube.com user "Chelsea Banks" has only one video, and has not conducted any interviews with any other person—only the one created by Dhanani.  And throughout the purported "interview," "Chelsea Banks" merely voices questions, with pauses where Dhanani's name is obviously inserted.

35.     More compelling, the image Dhanani used for "Chelsea Banks" is (if one simply takes a screen shot and conducts a Google image search) a stock photograph, available for purchase on GettyImages.com, which appears on literally hundreds of websites (most often as blogger "Laura Gayle" on www.theceshop.com), which a side-by-side comparison shows:



36.     Wilferd raised the apparently fictional or foreign-generated articles now appearing on www.wines.com/blog to Dhanani, but they continued to appear until July 2019.  After repeated attempts by Wilferd to coordinate with Dhanani on a plan to develop wines.com for sale, Dhanani said he would develop a strategy and respond by July 15, 2019, incidentally, the one year anniversary of the sale, after which applicable capital gains taxes would decline.  Dhanani responded to Wilferd in or around July 2019, suggesting that she write articles for the website and submit a plan to him.  After she did, however, Dhanani then suggested she

merely edit articles he had developed through foreign workers who could create content.

37.     After his last July 2019 response, Dhanani refused to respond to Wilferd and her repeated inquiries until October 8, 2019, when Wilferd discovered that wines.com had been sold to Brent Oxley, on August 27, 2019, as reflected in the WHOIS registration of the domain.  Oxley is the founder of HostGator.com, which he sold for over $300 million, and a well-known domain purchaser.  Oxley certainly had the means to pay value for wines.com.  And yet, Dhanani has recently claimed, through his attorneys, that he sold the domain and website to Oxley for a mere $200,000—well below any reasonable market value.

38.     When Plaintiff confronted him about the sale back in October 2019, Dhanani admitted that he sold the domain and website, but refused to provide any details regarding the sale, claiming he had no obligation to pay any of the profits to Wilferd, because he claimed the sale was a "corporate level" sale of assets, not sale of a "product" and therefore purportedly outside of the scope of the Profit Agreement or any other agreement.  During the entire period, Digital Equity failed to pay any profit-sharing to Wilferd under the Profit Agreement or any other agreement.

39.     Following the sale of the domain and website, Wilferd repeatedly requested an accounting from Digital Equity, including on April 17, 2020.  And while Dhanani indicated that he would be providing a March 2020 statement, he has never provided any accounting.  Indeed, his attorney in this action, Paul R. Barsness, stated on May 27, 2020, that "the P&L has not been prepared," and to date has refused to provide any bank records, or other accounting, despite repeated requests, and has refused to agree to early discovery to provide that information to Plaintiff.  To date, Defendants have provided nothing, showing their promises and purported claims that they "agreed" to provide an accounting were hallow and false.

40.     To be clear, Defendants have never agreed to provide any accounting. All claims that Defendants "would" provide an accounting have proven false.  And no proceeds from the sale of the domain and website have been provided to Plaintiff, but have been frivolously frittered away by Dhanani.  Indeed, shortly following the sale, Dhanani took several uncharacteristic trips to Miami and Las Vegas, among other locations, taking pictures of himself and posting them on Twitter.com under his profile "@iamkhuram," eating at expensive restaurants, like Nobu, and staying at expensive hotel suites, like The Diplomat Beach Resort Hollywood.  When this action was filed, and as recently as June 6, 2020,

Dhanani's Twitter profile was public.  He has since made his Twitter account private to conceal his continuing frivolous dissipation of sale proceeds.

41.     Furthering these efforts, immediately after notice that this action was filed, on May 12, 2020, Dhanani created a website for a venture capital firm Soft Stone Capital, LLC ("Soft Stone").  See ICANN, WHOIS Lookup, softstonecapital.com, https://lookup.icann.org/lookup (last visited May 22, 2020).  Soft Stone states that its purpose is to "Invest in businesses."  Soft Stone Capital, LLC, Focus, www.softstonecapital.com (last visited May 22, 2020)  It further states "Our process is quick:  Analyze the opportunity.  Perform due diligence.  Identify value-creation levers.  Create 100-day plan.  Complete the acquisition."  Id.  Soft Stone, however, was not a registered limited liability company in Delaware, where it claims its principal place of business is located, until May 21, 2020, the day after Dhanani was served with this action.

42.     As a consequence of Defendants' misconduct, Wilferd has lost the entirety of her life's work and retirement: wines.com.

## CAUSES OF ACTION
## COUNT I – ACCOUNTING
### (against all Defendants)

43.     Plaintiff incorporates by reference paragraphs 1 through 42 as if stated fully herein.

44.     A special relationship of trust and confidence existed between Plaintiff and defendants Dhanani and Digital Equity, with whom Plaintiff entered into a joint venture and upon whom Plaintiff relied to determine profits, sufficient to entitle Plaintiff to a right of access to, and an inspection and accounting of, the books and records of Digital Equity, which were in Defendants' exclusive possession, custody and control, and for which Dhanani was responsible for maintaining and providing access.

45.     Furthermore, Plaintiff entered into an enforceable contract with defendant Digital Equity, specifically providing for inspection and accounting rights in Paragraph 4 of their Profit Agreement, pursuant to which Digital Equity agreed to "provide [Wilferd] access to financial information upon request, including revenue, sales, expenses, screenshots, and profits."

46.     Plaintiff made several proper books and records requests between 2018 and 2020, including but not limited to on April 17, 2020, which to date, have been denied by Defendants.  Defendants have never agreed to the request or produced any documents by any date certain.  To the contrary, Defendants have merely made false claims that they "would" produce documents and for over a year, refused to produce any.

47.     Plaintiff is entitled to an order compelling the production of all Digital Equity books and records for inspection and an accounting by a date certain, if not immediately.

**COUNT II – BREACH OF CONTRACT AND COVENANT OF
GOOD FAITH AND FAIR DEALING
(against defendant Digital Equity, LLC)**

48.     Plaintiff incorporates by reference paragraphs 1 through 47 as if stated fully herein.

49.     Plaintiff entered into a valid, enforceable written **Profit Agreement** with defendant Digital Equity, dated July 15, 2018, with reasonably definite and certain terms, pursuant to which Digital Equity would pay "50% (fifty percent) of net profits after expenses that are generated by Company directly from product sales, advertising sales, accessory sales, affiliate sales, ticket sales, tour sales and commision [sic] sales."  As part of the contract, the law implied a covenant of good faith and fair dealing.

50.     Defendant Dhanani was not a party to the Profit Agreement, nor an express or intended third-party beneficiary of any of its provisions.

51.     Plaintiff performed all of her obligations under the agreement, and never violated any term or provision of the agreement.

52.     Defendant Digital Equity materially breached the agreement by failing to pay fifty percent of the profits from the sale of wines.com, which was a product sale under the Profit Agreement.  Further, Digital Equity breached the covenant of good faith and fair dealing by selling the domain and website in order to deny Wilferd profits from the operation of the website as contemplated in and under the terms of the Profit Agreement, and purportedly structuring the sale of wines.com in a manner so as to claim, and claiming to Wilferd, that it was not a product sale under the Profit Agreement in order to deny Wilferd her share of the proceeds.

53.     As a direct and proximate cause of Digital Equity's misconduct, Plaintiff suffered significant injury and damages.  Plaintiff seeks enforcement and damages arising only out of the **Profit Agreement**.

## COUNT III – BREACH OF CONTRACT AND COVENANT OF GOOD FAITH AND FAIR DEALING
### (against all Defendants)

54.     Plaintiff incorporates by reference paragraphs 1 through 53 as if stated fully herein.

55.     Plaintiff entered into a valid, enforceable oral joint venture agreement with Defendants in which they agree to jointly develop wines.com for sale to a third party and in connection therewith, Wilferd would enter into both the Domain and Profit Agreements with Digital Equity to facilitate the marketability and sale

of the domain and website.  As part of the agreement, Defendants agreed that

Dhanani (1) would invest $200,000-$300,000 of his own money into further

developing wines.com, and (2) in the arrangement, they would split all profits not

otherwise covered by the Profits Agreement, including to the extent not included in

the Profits Agreement, from the sale of the domain and website.  Further,

Defendants agreed that (3) they would not sell the domain for less than $3-4

million, (4) Wilferd would have the right to approve any sale, and (5) prior to any

sale, Defendants would actively operate the website as a "cash cow" to produce

monthly revenue—all constituting the "**Oral Agreement**."  As part of the contract,

the law implied a covenant of good faith and fair dealing.

56.     There is no written agreement, merger clause or disclaimers of any

kind, written or oral, between Plaintiff and Dhanani.  The Oral Agreement between

Plaintiff and Digital Equity alleged herein relates to matters outside the scope of

their Domain and Profit Agreements, and the merger clauses therein contained.

Indeed, the Domain Agreement merely relates to the transfer of wines.com from

Wilferd to Digital Equity, to facilitate the Profit Agreement, which relates to the

split of profits from various described categories of sales.  Neither the Domain or

Profit Agreement address the subject matter of the operating terms of the joint

venture of the parties, or the conditions of any sale of the website to a third-party, which were addressed by the Oral Agreement.

57.     In fact, Defendants admit in pleadings in this action that "[n]othing in either agreement limited Defendants' ability to re-sell the Domain Name."  [D.E. No. 16-1, at p.3 (Defs.' Mem.).]  Indeed, "nothing" in either agreement addressed the subject matter of Defendants' selling the domain name at all, which was covered by the Oral Agreement.

58.     Plaintiff performed all of her obligations under the agreement, and never violated any term or provision of the agreement.

59.     Defendants materially breached all of their obligations, failing to perform any of them.  Instead, and further in breach of the covenant of good faith and fair dealing, Defendants engaged foreign contractors to develop content, without Wilferd's approval or consent, sold the website without her consent, and purportedly structured a sale of the website by Digital Equity in a manner so as to claim, and claiming to Wilferd, that it was not a product sale under the Profit Agreement or part of any other agreement in order to deny Wilferd the profits to which she was entitled.

60.     As a direct and proximate cause of the Defendants' misconduct, Plaintiff suffered significant injury and damages.

## COUNT IV – BREACH OF FIDUCIARY DUTY
### (against all Defendants)

61.     Plaintiff incorporates by reference paragraphs 1 through 60 as if stated fully herein.

62.     Plaintiff was a profit-sharing partner in Digital Equity, a limited liability company, with Dhanani as its sole member, and a joint venture partner with Digital Equity and Dhanani, the principal officer and sole member of the company, in whom Plaintiff placed a special trust and confidence.  As joint venture and profit-sharing partners, Digital Equity and Dhanani owed Plaintiff a fiduciary duty of utmost good faith and loyalty.  As to Dhanani in particular, he occupied positions in which Plaintiff placed a near-critical level trust, faith and confidence in his judgment, business acumen and advice in performing the principal executive office of Digital Equity.

63.     There is no agreement or representation in any agreement between Plaintiff and Defendants that disclaims any joint venture relationship.  To the contrary, the parties combined property or labor in a joint undertaking for profit, with rights of mutual control.  Wilferd contributed the domain and website wines.com, as well as "new articles, new content, shar[ed] knowledge, and overall expertise" to Digital Equity, as part of a profit-sharing agreement to develop wines.com, in which Digital Equity contributed and the parties agreed to split

profits from the activities of the corporation.  Dhanani also contributed his time, and alleged experience and expertise into the development of wines.com.  The parties agreed to various rights allowing mutual control, including but not limited to content approval, and sale rights.

64.    Digital Equity materially breached its duty to Plaintiff by its bad faith sale of corporate products and failure (a) to provide accounting or books and records access to Plaintiff, as a means of hiding its fraud and misconduct from Plaintiff, and (b) to pay profits from the sale of wines.com, claiming falsely and in bad faith that it was a sale of an "asset" rather than a "product" under the Profit Agreement.

65.    Dhanani breached his fiduciary duty to Plaintiff by his bad faith (a) refusal to provide any accounting or books and records access to Plaintiff, as a means of hiding his fraud and misconduct from Plaintiff, (b) failure to invest money in or in any manner reasonably develop wines.com, and (c) claim that Plaintiff was not entitled to any profits from Digital Equity because the sale of wines.com was a sale of an "asset" rather than a "product" under the Profit Agreement.  In addition, Dhanani engaged in various acts of self-dealing, (d) transferring substantial profits to himself from Digital Equity.

66.     As a direct and proximate cause of Defendants' misconduct, Plaintiff suffered significant injury and damages.

## COUNT V – FRAUD
**(against defendant Khuram Dhanani)**

67.     Plaintiff incorporates by reference paragraphs 1 through 66 as if stated fully herein.

68.     Dhanani represented to Wilferd during their telephone conversations in and around July 2018, as part of a joint venture arrangement, that he (1) would invest $200,000-300,000 of his own money into further developing wines.com, (2) had a "team" who could help further develop the website to a $3-5 million valuation "fast," and (3) in the arrangement, they would split all profits, including the domain and website.

69.     Further, Dhanani claimed that (1) prospective buyers would not work with him unless the domain was transferred to Digital Equity, (2) he already had an interested company willing to pay $200,000 for advertising on the website, and (3) Wilferd would receive $100,000 within thirty days, in addition to further payments for product sales, which would only increase as the Christmas season approached. In addition, Dhanani represented that (4) Defendants would not sell the domain for less than $3-4 million, (5) Wilferd would have the right to approve any sale, and

(6) prior to any sale, they would actively operate the website as a "cash cow," producing between $5,000 and $10,000 per month in profits.

70.    All of these representations were intentionally and knowingly false at the time they were made, and were made with the intent that Wilferd would rely upon them.

71.    Wilferd reasonably and justifiably relied upon the representations in entering into the **Domain Agreement** with Dhanani's company, Digital Equity, given Dhanani's claimed superior business acumen and experience in operating websites and domain product sales.  Wilferd did not know and had no reason or means to know that the statements were false.

72.    As a direct and proximate cause of Dhanani's misconduct, Plaintiff suffered significant injury and damages.  Plaintiff therefore seeks rescission of the **Domain Agreement**.

### COUNT VI – FINANCIAL ABUSE OF AN ELDER IN VIOLATION OF CAL. WELF. & INST. CODE § 15657.5 (against all Defendants)

73.    Plaintiff incorporates by reference paragraphs 1 through 72 as if stated fully herein.

74.    At all times relevant hereto, the fraud and breach of fiduciary duty complained of herein were directed to California.  Wilferd resides in California,

and all communications by Defendants to Wilferd occurred while she was in California. Defendants had knowledge that Wilferd resided in California, and that they were soliciting agreements with and funds from a California resident. Wilferd's bank accounts are located in California, and all funds complained about here in were obtained from California. The domain at issue here wines.com was originally purchased and registered in California, to Wilferd. The website www.wines.com was created and developed in California, by Wilferd, and all the work that she was to perform under her agreements with Defendants, was to be performed in California. The injury suffered by Wilferd occurred in California. The only connection to Georgia is that Defendants reside or are in incorporated in Georgia; otherwise, all the transactions were directed to California. And even that connection to Georgia is marginal. Indeed, Digital Equity has no corporate offices, but its business address registered with the Georgia Secretary of State is The UPS Store.

75.     Under Cal. Welf. & Inst. Code § 15610.30, "'[f]inancial abuse' of an elder or dependent adult occurs when a person or entity does any of the following: (1) [t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both" or "(2) [a]ssists in taking, secreting, appropriating, obtaining, or retaining real or

personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both."

76.    Wilferd is an elder under § 15610.27, as she was over the age of 65 and resided in California at all times during the period and with respect to the conduct alleged herein.

77.    Dhanani and Digital Equity both took, secreted, appropriated, and obtained personal property from Wilferd, and assisted in such action, with intent to defraud, specifically in obtaining wines.com at a nominal transfer fee, with knowingly false claims that they would share profits in the development and sale of the domain and website, thereby violating § 15610.30.

78.    Pursuant to Cal. Welf. & Inst. Code § 15657.5, "[w]here it is proven by a preponderance of the evidence that a defendant is liable for financial abuse, as defined in Section 15610.30, in addition to compensatory damages and all other remedies otherwise provided by law, the court shall award to the plaintiff reasonable attorney's fees and costs."

79.    As a direct and proximate cause of Defendants' misconduct, Plaintiff suffered significant injury, damages, attorneys' fees and costs.

## COUNT VII – DEFAMATION
## (against all Defendants)

80.     Plaintiff incorporates by reference paragraphs 1 through 79 as if stated fully herein.

81.     Between April and July 2019, Defendants published to third parties on the website wines.com, where Plaintiff is known to write articles, various articles attributed to Plaintiff without her permission or consent, which she did not author.

82.     As a professional writer, the false attribution of the sexually salacious, pornographic, and in some instances degrading, and grammatically incorrect, articles to Plaintiff was a substantial disparagement to her name and profession, and caused or at least are likely to cause serious harm to the reputation and good name of Plaintiff.

83.     Indeed, a Google search of Jacklyn Wilferd returns one of the most offensive articles published and falsely attributed to Plaintiff: "PORN STAR SYDEY COLE CALLED HER FAVOURITE WINES (ENG)," attributing to Plaintiff statements such as:

> • Sydney Cole … <u>What I like the most about her are the boobs.</u>  She doesn't have big boobs, but they look magnificent.  Her cup size is 32B, but the nipples are the ones that matter.  She has big areolas that are the perfect size for sucking.  Although she has puffy nips, they are hard and pointy.  … <u>She will surely change a bit in the next period, as she is only 20 years old now and her body will still change for the</u>

next couple of years, but I'm sure she will look just as hot, if not hotter.

- Teenage girls can be the worst.  They're hot as hell with loud mouths and bitchy attitudes.  They know they are jailbait yet still walk around in tiny shorts with their ass cheeks hanging out.  Then they hit 18 and are fully legal for you to watch in porn.  The naughtiest among them love being on camera and showing that fresh pussy to the world. That's when teenage girls become the absolute best!

84.     Defendants authored, participated in the creation of or otherwise caused and approved these abhorrent, sexist and degrading statements to be published without justification, privilege or other defense.  Upon information and belief, these statements were not independently made by third parties.

85.     As a direct and proximate cause of Defendants' misconduct, Plaintiff suffered significant injury and damages.

**COUNT VIII – DECLARATORY JUDGMENT**
**(against all Defendants)**

86.     Plaintiff incorporates by reference paragraphs 1 through 85 as if stated fully herein.

87.     An actual controversy has arisen and exists between the parties, insofar as there is a real dispute caused by the assertion by Plaintiff of a right in which she has a definite interest, specifically: (a) to access and conduct an inspection of the books and records of Digital Equity, (b) an accounting, and (c) payment of profits arising out of the sale of wines.com, a product sale under the

Profit Agreement between the parties, among other and future profits to which she claims she is entitled under the Profit Agreement.

88.     This action is not duplicative of nor seeks relief the same as other causes of actions, but seeks a declaration to which Plaintiff is entitled that further clarifies the rights of the parties as to the subject matter herein.

89.     Thus, Plaintiff seeks a declaration requiring Defendants to provide access to, and an inspection and accounting of, the books and records of Digital Equity, pay fifty percent of any profits from the sale of wines.com to Plaintiff and all other future profits from sales under the categories enumerated in the Profit Agreement.

90.     The requested declaration is necessary for the parties to be certain about their rights, duties, obligations, status and legal relations, and to preserve those rights, which without speedy relief might otherwise be impaired or lost.

91.     The parties have actual, present, antagonistic interests, which are properly before and justiciable by the Court, and the relief sought is not merely for legal advice from the Court or answers to question propounded by curiosity.

**WHEREFORE**, Plaintiff prays that the Court enter a judgment:

> (a)     declaring that Defendants are required to provide access to, and an inspection and accounting of, the books and records of Digital Equity, within thirty (30) days of the date of the order of the Court, and that the Profit

Agreement entitles Plaintiff to future profits with respect to sales under the categories enumerated therein;

(b)     rescinding the Domain Agreement between Plaintiff and Digital Equity;

(c)     awarding damages, including compensatory and punitive damages, to Plaintiff in an amount to be determined at trial, including but not limited to under O.C.G.A. § 51-12-5.1, and trebled damages pursuant to Cal. Civ. Code § 3345(b);

(d)     awarding Plaintiff her costs and any reasonable attorneys' fees, including but not limited to pursuant to O.C.G.A. § 13–6–11 as Defendants acted in bad faith, already have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense; and

(e)     granting Plaintiff such further and other relief as the Court may deem just and appropriate under the circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  Chicago, Illinois            Respectfully submitted,
       June 11, 2020

JACKLYN WILFERD, by and through her attorneys,


By:/s/John H. Ray, III_____
John H. Ray, III (admitted pro hac vice)

Ray & Counsel, P.C.
10044 South Leavitt Street
Chicago, IL 60643

(312) 772-6420 (p) (312) 940-5831 (f)
jray@rayandcounsel.com

Kelli B. Hooper (GA Bar No. 106130)
KBH Law, Inc.
1415 Highway 85 North, Suite 310-336
Fayetteville GA, 30214
(678) 466-9846 (p) (800) 466-5015 (f)
kelli@kbhooper.com

*Attorneys for plaintiff Jacklyn Wilferd*

## <u>CERTIFICATE OF SERVICE</u>

 I, John H. Ray, III, hereby certify that on June 11, 2020, I caused a true and correct copy of the foregoing amended complaint to be served electronically on all parties of record by the Court's CM/ECF system.


     /s/ John H. Ray, III
     John H. Ray, III (admitted pro hac vice)